UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 19-CR-20182-RUIZ

UNITED STATES OF AMERICA,

v.

EDWARD MINNIS,

    Defendant.

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE comes before the Court on Defendant Edward Minnis's Motion for Compassionate Release ("Motion") [DE 194]. Defendant asks the Court to reduce his sentence to time served pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), as amended by the First Step Act. This Motion has been referred to me by the Honorable Rodolfo A. Ruiz, II [DE 202]. I have reviewed the Motion, the Government's Response and the exhibits thereto [DE 198], and Defendant's Reply [DE 201]. Additionally, on January 6, 2021, I held a hearing at which I received further arguments from counsel [DE 206]. Having considered these pleadings, the arguments presented at the hearing, and other relevant portions of the record, I respectfully **RECOMMEND** that Defendant's Motion be **GRANTED**.

### I.    BACKGROUND

On July 10, 2019, Defendant pled guilty to two counts of conspiracy to possess with intent to distribute cocaine, in violation of Title 21, United States Code, Sections 841(a)(l), 841(b)(l)(C), and 846, and one count of possession of a firearm by a convicted felon, in violation of Title 18, United States Code, Section 922(g)(l). [DE 96, 99]. The charges stemmed from multiple controlled purchases by a confidential source of cocaine Defendant supplied to others, intercepted conversations between Defendant and multiple individuals discussing the sale of controlled

1

substances, and a search of Defendant's residence, which uncovered cocaine, a stolen firearm, and ammunition in Defendant's dresser. [DE 100].

On October 21, 2019, the Court sentenced Defendant to serve a term of 46 months' imprisonment. [DE 165, 167]. This sentence reflected the low-end of Defendant's advisory guideline range, after the Court had considered the effect of the firearm found in Defendant's residence on his eligibility for "safety valve" relief under section 5C1.2 of the U.S. Sentencing Guidelines ("U.S.S.G."). [*See* DE 205]. The sentence also reflected the Court's careful consideration of the factors in 18 U.S.C. § 3553, including discussion of testimony the Court heard from Defendant's employer, daughter, and others, as well as comparison of Defendant's culpability and resulting sentence with that of his co-defendants. *Id*. The Court allowed Defendant to self-surrender, which he did on November 18, 2019. Thus, Defendant has served approximately 14 months of his 46-month sentence, and he is scheduled to be released (anticipating "good time" credit) on February 15, 2023.

In his Motion, Defendant seeks immediate release from Bureau of Prisons ("BOP") custody based on the COVID-19 pandemic. More specifically, he asserts that the increased likelihood of contracting COVID-19 while in BOP custody, combined with factors that increase his risk of suffering severe illness if he does contract COVID-19, creates "extraordinary and compelling reasons" justifying his immediate release. Defendant asserts that the spread of COVID-19 has been rampant throughout BOP facilities in general and within his facility in Butner, North Carolina, in particular. As to particular risk factors for severe COVID-19 symptoms, Defendant points to his age (63 years old), his race (Black), and several medical conditions identified in his BOP medical records: an unspecified heart disease and heart failure (including indications of irregular heartbeat and the presence of an implanted defibrillator), high blood pressure, high

cholesterol, and prostate cancer (which is currently in remission).  If released, Defendant proposes that he would quarantine at his residence in Tamarac, Florida, with his fiancée, where he could be subject to a special term of supervised release with a condition of home confinement for the unserved portion of his prison sentence.

## II.     ANALYSIS

"A district court may modify a sentence only if the modification is authorized by a statute or a rule." *United States v. Monaco*, No. 20-10052, 2020 WL 6194688, at *2 (11th Cir. Oct. 22, 2020) (citing *United States v. Puentes*, 803 F. 3d 597, 605-06 (11th Cir. 2015)).  Title 18, United States Code, Section 3582(c)(1)(A), states that, in any case

> the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
>   (i) extraordinary and compelling reasons warrant such a reduction . . .
>
>   and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

Congress has not defined what constitutes "extraordinary and compelling reasons" other than that "[r]ehabilitation of the defendant alone" is insufficient. 28 U.S.C. § 994(t). The statute directs the Sentencing Commission to promulgate "the criteria to be applied and a list of specific" extraordinary and compelling examples.  *Id.*

Prior to the First Step Act, the Sentencing Commission promulgated a policy statement at U.S.S.G. § 1B1.13, stating in pertinent part that a court may reduce a sentence of imprisonment if, after considering the § 3553 factors, it finds that

3

(1)     (A) extraordinary and compelling reasons warrant the reduction; or
(B) the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

(2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) the reduction is consistent with this policy statement.

That policy statement included application notes providing further guidance on what constitutes "extraordinary and compelling reasons." As to medical conditions, those application notes described "extraordinary and compelling reasons" as including when the defendant is "suffering from a serious physical or medical condition that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, cmt. n.1(A)(ii). The policy statement's application notes also include a catch-all for an "extraordinary and compelling reason other than, or in combination with, the reasons" otherwise articulated, as determined by BOP. *Id.* § 1B1.13, cmt. n.1(D).

A growing number of federal courts around the country, including all four circuit courts of appeals that have ruled on the issue, have determined that U.S.S.G. § 1B1.13 is not an "applicable policy statement" when prisoners bring their own motion for compassionate release (as the guideline only contemplates motions brought by BOP) and that courts are thus not confined to § 1B1.13's description of "extraordinary and compelling reasons." *See United States v. Brooker*, 976 F.3d 228 (2d Cir. 2020); *United States v. Jones*, 980 F.3d 1098 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178 (7th Cir. 2020); *United States v. McCoy*, 981 F.3d 271 (4th Cir. 2020). *See also United States v. Cano*, No. 95-CR-00481-CMA, 2020 WL 7415833 (S.D. Fla. Dec. 16, 2020); *United States v. Macroy*, No. 17-CR-60288-BB, 2021 WL 86770 (S.D. Fla. Jan. 11, 2021).

Regardless, the factors set forth in the policy statement provide a useful framework for the Court's analysis. *United States v. Campbell*, No. 91-CR-06093-BB, 2021 WL 53187, at *5 (S.D. Fla. Jan. 5, 2021).

Thus, in order to grant Defendant's request pursuant to § 3582(c)(1)(A), the Court must: (1) find that Defendant has exhausted his administrative remedies with the BOP; (2) weigh the relevant § 3553(a) factors; (3) conclude that extraordinary and compelling reasons warrant compassionate release in this case; and (4) determine that Defendant is not a danger to the community. *United States v. Weems*, No. 18-CR-60185-BB, 2020 WL 4558381, at *4 (S.D. Fla. Aug. 7, 2020); *United States v. Taffe*, No. 16-CR-60300-RAR, 2020 WL 6700445, at *2 (S.D. Fla. Nov. 9, 2020). Defendant bears the burden of establishing that compassionate release is warranted. *See United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013). Further, even if Defendant satisfies his burden, the Court "retains discretion to determine whether a sentence reduction is warranted." *Id*.

Here, the parties agree that Defendant has exhausted his administrative remedies with the BOP. [*See* DE 194-1] (showing BOP's rejection of Defendant's request for compassionate release); [DE 198 at p. 11 n.2].

### A. **Extraordinary and Compelling Reasons**

Defendant argues that the risk to his health from the COVID-19 pandemic while incarcerated constitutes "extraordinary and compelling reasons" to warrant a reduction in his sentence. Specifically, he asserts that the increased risk of infection in his BOP facility, combined with the increased risk of experiencing severe effects from COVID-19 due to his age and pre-existing medical conditions, creates extraordinary and compelling reasons. In addition to enumerating the steps that BOP has taken to minimize the spread of COVID-19 within its facilities,

the Government argues that Defendant has not shown that any of his medical conditions satisfy the criteria for "extraordinary and compelling reasons" found in U.S.S.G. § 1B1.13 n.1(A). The Government acknowledges that inmates that have conditions that the CDC has recognized as increasing a person's risk of serious illness from COVID-19 can demonstrate "extraordinary and compelling reasons" but asserts that Defendant has no such condition. [DE 198 at 13].

"Courts around the country have recognized that the risk of COVID-19 to people held in jails and prisons 'is significantly higher than in the community, both in terms of risk of transmission, exposure, and harm to individuals who become infected.'" *United States v. Schumack*, No. 14-CR-80081-DMM, 2020 WL 4333526, at *2 (S.D. Fla. June 11, 2020) (collecting cases). Although the Government's response details measures that BOP has implemented to mitigate the risk of infection and care for those in its custody, it is clear that even BOP's best efforts can only do so much to limit the spread of infection in an environment where inmates' abilities to practice social distancing and other self-protection measures is necessarily curtailed.

Defendant is incarcerated at the Butner Federal Corrections Complex, which consists of several different facilities. Defendant is currently located at FCI Butner Medium I. That facility currently has only 2 inmates with confirmed positive infections and 2 staff members with confirmed positive infections, both among the lowest in the BOP system.[1] Yet, this facility has

---

[1] Federal Bureau of Prisons, COVID-19, https://www.bop.gov/coronavirus/ (last visited Jan. 12, 2021). As at least one other judge in this district has observed, these statistics are necessarily limited by the amount of testing done at the facility. *See United States v. Chopra*, No. 18-CR-20668-DMM, 2020 WL 4333507, at *1 n.4 (S.D. Fla. July 24, 2020). It is also unclear the extent to which BOP's testing regiment seeks to identify positive-but-asymptomatic personnel entering the facility.

had 165 inmates who have recovered from a coronavirus infection,[2] out of a total population of approximately 701, suggesting that up to 23% of inmates (not accounting for inmates moving in or out) have been infected at one time or another.[3] FCI Butner Low, where Defendant was housed at the time of his motion, has had an even higher infection rate, reporting a total of 568 recovered inmates with a total population of 770.[4] Meanwhile, another facility within the same FCC, FCI Butner Medium II, has one of the highest totals of currently infected inmates in the country, at 174, albeit in a much larger total population of nearly 1,400 inmates.[5] Butner Medium I, and Defendant's former facility, Butner Low, have also had among the highest number of inmate deaths in the country, with 9 and 17 deaths, respectively.[6] None of this is to suggest that BOP is not taking significant measures to protect its inmates; rather, these statistics highlight the elevated risk of infection to inmates despite BOP's best efforts.

---

[2] The evidence before me does not indicate that Defendant has already been infected and recovered. There are records suggesting a potential positive test in the summer of 2020. [DE 198 at pp. 55, 58]. At the hearing on January 6, 2021, Defendant indicated that he had been quarantined along with other asymptomatic inmates in the same "cube." However, neither party could provide evidence that Defendant himself had actually tested positive.

[3] Federal Bureau of Prisons, COVID-19, https://www.bop.gov/coronavirus/ (last visited Jan. 12, 2021); Federal Bureau of Prisons, FCI BUTNER MEDIUM I, https://www.bop.gov/locations/institutions/but/ (last visited Jan. 12, 2021).

[4] Federal Bureau of Prisons, COVID-19, https://www.bop.gov/coronavirus/ (last visited Jan. 12, 2021); Federal Bureau of Prisons, FCI BUTNER LOW, https://www.bop.gov/locations/institutions/buf/ (last visited Jan. 12, 2021).

[5] Federal Bureau of Prisons, COVID-19, https://www.bop.gov/coronavirus/ (last visited Jan. 12, 2021); Federal Bureau of Prisons, FCI BUTNER MEDIUM II, https://www.bop.gov/locations/institutions/btf/ (last visited Jan. 12, 2021).

[6] Federal Bureau of Prisons, COVID-19, https://www.bop.gov/coronavirus/ (last visited Jan. 12, 2021).

As the Government notes, the existence of the COVID-19 pandemic is not, itself, a sufficient reason to reduce a given inmate's sentence. *See*, *e.g.*, *United States v. Garvin*, No. 19-CR-60377-RAR, 2020 WL 7059354, at *3 (S.D. Fla. Dec. 2, 2020). However, courts within this district have "repeatedly [held] that if an inmate has a chronic medical condition that has been identified by the Center of Disease Control as elevating an inmate's risk of becoming seriously ill from COVID-19, that condition may constitute 'extraordinary and compelling reasons' for compassionate release . . . ." *United States v. Burkes*, No. 18-CR-80113-RLR, 2020 WL 6481984, at *2 (S.D. Fla. Oct. 21, 2020) (quoting *United States v. Little*, No. 18-CR-60013-JIC, DE 66 (S.D. Fla. Sept. 4, 2020)). *See also Garvin*, 2020 WL 7059354, at *3 (noting that some courts have found the COVID-19 pandemic "together with a diagnosed medical condition that puts an inmate at high risk of contracting and suffering an adverse outcome, is an important factor in the extraordinary and compelling inquiry" (citation omitted)).

The CDC maintains that, "[a]dults of any age with certain underlying medical conditions are at increased risk for severe illness from the virus that causes COVID-19. Severe illness from COVID-19 is defined as hospitalization, admission to the ICU, intubation or mechanical ventilation, or death."[7] Among these conditions are "[h]eart conditions, such as heart failure, coronary artery disease, or cardiomyopathies." *Id*. Defendant's BOP medical records indicate that he has a heart condition that includes indications of heart failure. A BOP record cataloging his health conditions show a diagnosis of "heart disease (unspecified)" from March 22, 2019, noting the presence of an implanted defibrillator. [DE 198 at p. 250]. The same record shows notations

---

[7] Centers for Disease Control and Prevention, People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited Jan. 12, 2021).

from two different doctors of the condition of "heart failure" from November 18, 2019 and December 11, 2019. *Id.* Another record from October 2, 2020, shows a "current" assessment of "heart failure" and "heart disease (unspecified)." *Id.* at p. 39. As recently as September 24 and 25, 2020, Defendant experienced bradycardia (a slow heartbeat), reporting palpitations and dizziness. *Id.* at p. 43. Notes from that episode included that "12-Lead obtained and showed Sinus brady with 1st degree heart block." *Id.* at p. 47.

The Government asserts that this evidence is insufficient to show that Defendant has the kind of heart condition or conditions that the CDC identifies as presenting an increased risk of severe illness from COVID-19. Admittedly, Defendant's BOP records are vague about the precise heart condition from which Defendant suffers. However, the notations of "heart failure," even if vague, combined with the presence of an implanted defibrillator and a recent episode of slow heartbeat are sufficient for the Court to determine that Defendant suffers from the kind of heart condition noted by the CDC. Moreover, the fact that Defendant has been receiving (apparently adequate) treatment for his heart condition while in BOP custody misses the point. Were Defendant simply arguing that he is not receiving adequate treatment for his heart condition (and other conditions discussed below), the Court would have to disagree and find no extraordinary or compelling reasons for a reduction in sentence. However, the question is whether Defendant's conditions, even if themselves treated, create an unacceptable risk of severe illness from COVID-19 if infected.

Defendant presents three other relevant medical conditions – hypertension (high blood pressure), hyperlipidemia (high cholesterol), and prostate cancer (previously treated and now in remission). [DE 198 at pp. 39-41, 125]. The first two of these conditions are among a category

9

of conditions that the CDC posits "might" increase one's risk of severe illness from COVID-19.[8] Meanwhile, although the CDC recognizes that a current bout of cancer puts an individual at increased risk for severe illness, it is unknown whether a history of cancer has an effect.[9] The Government argues that conditions the CDC says only "might" increase one's risk of severe illness are insufficient to establish extraordinary and compelling reasons and that Defendant fails to explain how his former cancer diagnosis should have any impact on the Court's analysis.

I agree that Defendant's hypertension and hyperlipidemia do not by themselves suffice to satisfy Defendant's burden of establishing extraordinary and compelling circumstances. However, as the Government appeared to concede at oral argument, they are risk-elevating factors that the Court can, and should, consider in conjunction with the heart condition described above. *See Weems*, 2020 WL 4558381, at *5 (considering hypertension as an "elevating risk factor" in conjunction with conditions more definitively described by the CDC as creating a risk of severe illness); *Burkes,* 2020 WL 6481984, at *2 n.1 (same); *United States v. Potts*, No. 06-CR-80070-DMM, 2020 WL 5540126, at *5 (S.D. Fla. Sept. 14, 2020) (same).

---

[8] Centers for Disease Control and Prevention, People with Certain Medical Conditions, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html#cancer (last visited Jan. 13, 2021).

[9] Defendant reportedly received radiation treatment around 2017 to treat his prostate cancer [DE 198 at pp. 152, 236-38], which could potentially suppress one's immune system. *See Campbell*, 2021 WL 53187, at *6. However, Defendant has presented no evidence regarding the amount of radiation treatment he received nor alleged any current impact on his immune system from that treatment.

Defendant's age is also a significant exacerbating, risk-elevating factor.  Risk for severe illness from COVID-19 increases with age, with older adults at the highest risk.[10]  Indeed, people 50-64 years old are 4 times more likely to be hospitalized, and 30 times more likely to die, if infected by COVID-19 than 18-29 year-olds.[11]  At 63 years old, Defendant is notably near the top of this age range, and the disparities become even greater in the next age range.  *Id*.  Again, I agree with the Government that age alone, even in light of the COVID-19 pandemic, cannot establish extraordinary and compelling circumstances.  However, Defendant is not arguing that his age alone enables him to meet his burden.  Rather, Defendant's age is another contributing factor that further increases the already heightened risk of severe illness he faces due to his medical conditions.

In sum, I find that when viewing all Defendant's circumstances as a whole – a condition of heart failure that is on the CDC's list of conditions that create an elevated risk of severe illness; multiple additional medical conditions that the CDC recognizes might further elevate that risk; and an age that further significantly increases that risk – Defendant has met his burden of demonstrating extraordinary and compelling reasons weighing in favor of compassionate release.

---

[10] Centers for Disease Control and Prevention, Older Adults, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited Jan. 13, 2021).

[11] *Id*.

### B. 18 U.S.C. § 3553

I also find that, while close, the factors in 18 U.S.C. § 3553(a) weigh in favor of compassionate release. The factors the Court must consider include, among others, the nature and circumstances of the offense and the history and characteristics of the defendant, as well as the need for the sentence imposed to: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment for the offense; (4) afford adequate deterrence to criminal conduct; and (5) protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a).

In only October 2019, this Court, weighing the same § 3553(a) factors, concluded that 46 months was an appropriate sentence for this Defendant. The Court did so after careful consideration of the § 3553(a) factors. In particular, the Court's analysis accounted for Defendant's culpability in comparison to his co-defendants and the seriousness of his offense, in light of the amount of cocaine for which Defendant was responsible, his heavy involvement in the charged conspiracy, and his possession of a firearm. [DE 205 at pp. 11-12]. The Court also, based on letters and testimony from Defendant's employer, family, and community members, weighed "the kind of person he is and that he has many redeemable qualities and he has done a good job in terms of his fatherly obligations and has been found to be trustworthy." *Id*. at p. 12.

The question, then, is what has changed in the relatively short amount of time since the Court determined that 46 months was the appropriate sentence? Obviously, the most significant change is that the risk of Defendant contracting severe illness, as detailed above, materially changes the conditions, and the potential consequences, of his incarceration. Significantly, at sentencing this Court noted that even "understanding that he doesn't have the best in medical background . . . I don't think the sentence is one that will not allow him to get out." *Id*. at p. 37. The risk of illness Defendant now faces necessarily changes that calculus. Defendant's offense

remains very serious, particularly in light of his possession of a firearm. However, the risk of illness he faces from continued incarceration creates harsher conditions than necessary to provide both adequate punishment and deterrence for his offense. Further, although a far less impactful factor, the fact that Defendant has behaved well while in custody (in addition to during his pre-sentence release) reinforces the Court's prediction that "by the end of the day you will never be engaged in this criminal behavior again." *Id*. at p. 35.

That Defendant has only served 14 months (approximately 30%) of the 46-month sentence that the Court previously found appropriate does weigh against reducing his sentence, as does the fact that reducing his sentence would create a disparity with his co-defendants whom the Court found to be deserving of lower sentences than Defendant. However, the fact that the Court can (and should) place Defendant on a special term of supervised release for the remainder of his sentence, with a special condition requiring home confinement, provides the Court with the option to continue providing punishment, deterrence, and protection of the public while mitigating the risk of severe illness. Moreover, to the extent that Defendant's sentence no longer would reflect a more severe punishment than less-culpable co-defendants, the disparity in their respective medical conditions drives that result. Therefore, while it is a close question, I do find that the § 3553(a) factors weigh in favor of granting the motion.

### C. **Danger to the Community**

Finally, the Court must evaluate whether Defendant is a danger to the safety of others or the community under 18 U.S.C. § 3142(g). In making this determination, courts should consider "(1) the nature and circumstances of the offense charged . . .; (2) the weight of the evidence against the person; (3) the history and characteristics of the person . . .; and (4) the nature and seriousness

of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g). These factors mirror many of the factors considered under § 3553(a).

The nature of Defendant's offense, and particularly the presence of a firearm, weigh strongly against him. However, I do find significant that Defendant was nevertheless granted a bond and apparently remained out on bond without incident during the pendency of the case. More significantly, this Court allowed Defendant to remain out on bond both prior to sentencing and, for 30 days, after sentencing (again without incident). Notably, the Government acknowledged at the January 6, 2020 hearing that its agreement to allow Defendant to self-surrender weighs in favor of Defendant here. Regardless, the Court's post-plea release decisions implicitly included a finding, by clear and convincing evidence, that Defendant was not a danger to the community. *See* 18 U.S.C. § 3143. I also find significant the long gap between the offense of conviction and Defendant's previous criminal history, as well as this Court's observation at sentencing of Defendant's "palpable remorse." [DE 205 at p. 32]. Moreover, the condition of home confinement as a special term of supervised release – with the risk of re-incarceration for any violation during that period – also mitigates the risk that Defendant will recidivate or otherwise endanger the community.

### III.   CONCLUSION

For the foregoing reasons, I respectfully **RECOMMEND** that Defendant's Motion for Compassionate Release [DE 194] be **GRANTED**. I further **RECOMMEND** that the Court:

1. reduce Defendant's sentence to **TIME SERVED** as of the date of any order adopting this Report and Recommendation and impose a term of supervised release equal to the unserved portion of the original term of imprisonment (with a special condition of home confinement enforced by electronic monitoring);

2. direct defense counsel to work with the United States Probation Office to obtain approval for a release plan;

3. direct the Federal Bureau of Prisons to release Defendant upon approval by the United States Probation Office of a release plan and direct Defendant to quarantine for at least 14 days upon release; and

4. direct Defendant to report by telephone to the United States Probation Office within 48 hours of release.

The parties will have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Rodolfo A. Ruiz, II, United States District Judge. Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (1989); 11th Cir. R. 3-1 (2016).

Done and submitted in Ft. Lauderdale, Florida this 14th day of January, 2021.

Jared M. Strauss
United States Magistrate Judge